UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, a corporation,**<br><br>Plaintiff,<br><br>v.<br><br>**UPS GROUND FREIGHT, INC., d/b/a UPS FREIGHT, a corporation,**<br><br>Defendant. | Civ. Nos. 13-3726<br>& 13-3727  (KM)(MAH)<br><br>**MEMORANDUM OPINION** |

**MCNULTY, District Judge**

This action under the Carmack Amendment, 49 U.S.C. § 14706 *et seq.*, arises from damage to two interstate shipments of goods. The Plaintiff, Indemnity Insurance Company of North America ("Indemnity"), is the subrogating insurance company for the owner of the freight, G.E. Healthcare. (I will refer to the plaintiff as "GE".) The Defendant, UPS Ground Freight, Inc. ("UPS"), is a motor carrier. Now before the Court is the UPS's motion (ECF no. 57), pursuant to Fed. R. Civ. P. 56, for partial summary judgment to limit and cap damages. If granted, the motion will limit damages to about $15,000; if denied, damages may total $1 million. Although many of the underlying facts are uncontested, the contractual issues still pose genuine, material issues of fact. For the reasons stated herein, the motion will be DENIED.

1

## I. Factual Background: The Bills of Lading and the Agreements[1]

This action arises from two shipments of goods, evidenced by bills of lading dated July 19, 2010, and May 25, 2012. The plaintiff alleges damages of $641,416.66 on the 2010 shipment, and $398,068.28 on the 2012 shipment. Those figures total $1,039,484.94. The defendant contends that damages are contractually limited to the value of goods declared on the bills of lading: $2.30 per pound, which comes out to $9,255.20 on the 2010 shipment, and $6,467.60 on the 2012 shipment. (PSMF ¶¶ 1–8; 2010 BL; 2012 BL) Those figures total $15,772.80.

Both shipments originated from a Memphis, Tennessee warehouse. GE had a contract with the warehouse operator, DLSS (the "Warehouse Contract").[2] DLSS agreed to serve as distributor of record and to stage shipments of GE's goods. In the Warehouse Contract, DLSS agreed to "prepare shipping documentation" and otherwise comply with standard operating procedures. (Warehouse Contract pp. 15–17 (Attachment A), ¶¶ 1(a)(iii), 4) The Warehouse Contract provides that the Warehouse "will release rail or truck shipments at the lowest valuation permitted and will not declare value on Products shipped." (Warehouse Contract p. 25 (Attachment D)) The Carrier, UPS, is not a party to the Warehouse Contract.

The July 19, 2010 bill of lading, issued on GE's behalf by the warehouse, describes the freight as 4 skids containing 656 cartons of "drugs and

---

[1] Herein, citations to the record are abbreviated as follows:
Cplt. = Amended Complaint, ECF no. 50
GE Contract = Less-than-Truckload Transportation Contract, ECF no. 57-3 at 6
DSMF = Defendant's Statement of Undisputed Material Facts, ECF no.
PSMF = Plaintiff's Statement of Undisputed Material Facts, ECF no.
Warehouse Contract = Contract between GE and DLSS, ECF no. 57-3 at 41.
2010 BL = Bill of lading dated July 19, 2010, ECF no. 57-3 at 2.
2012 BL = Bill of lading dated May 25, 2012, ECF no. 57-3 at 4.

[2] DLSS was formerly known as DDN/Obergefel, LLC. This opinion will ignore the distinction.

medicines" weighing 4,024 pounds. This bill of lading explicitly states the "R. Value" (Release Value) of the freight as $2.30/lb. The goods are designated as "NMFC 60000," a National Freight Motor Classification, and "Class 70," which signifies a dollar value for "drugs and medicines" of $2.30 per pound. (2010 BL; PSMF ¶¶ 2–5)

The May 25, 2012 bill of lading describes the freight as 3 pallets containing 557 cartons of "drugs and medicines" weighing 2812 pounds. This bill of lading explicitly states the "R. Value" (Release Value) of the freight as $2.30/lb. The goods are designated as "NMFC 60000," a National Freight Motor Classification, and "Class 70," which signifies a dollar value for "drugs and medicines" of $2.30 per pound. (2012 BL; PSMF ¶¶ 6–8)

As of January 12, 2010, GE as "Shipper" entered into a Less-than-Truckload Transportation Contract with UPS as "Carrier."[3] That GE Contract, as I shall call it, provides at section 7(A):

> A. Carrier is liable to Shipper for full invoice value (see paragraph E) of Shipper's goods for loss or damage to goods occurring while in the custody, possession or control of Carrier or resulting from Carrier's performance of or failure to perform the services provided for in this motor carrier Contract....

GE Contract § 7(A) (the "Full Invoice Value" provision).

The cross-referenced paragraph 7(E) provides:

> E. Except as otherwise provided, Carrier's maximum liability will not exceed $250,000 per occurrence.

GE Contract § 7(E) (the "$250,000 Limit" provision).

The GE Contract also has an override provision, paragraph 2(E):

> E. To the extent that any bills of lading, or other shipment documents used in connection with transportation services provided pursuant to the contract are inconsistent with the terms and conditions of this contract (including the terms and conditions of Appendices or Exhibits incorporated by reference), the terms and conditions of this Contract (and any incorporated Appendices and Exhibits) shall govern.

---

[3]   Actually the contracting party was Overnite Freight, the predecessor of UPS. This opinion will ignore the distinction.

GE Contract § 7(E) (the "Override Provision").

The GE Contract contains an "Entire Contract" clause, providing that its terms cannot be modified or waived except by a writing signed by both parties. GE Contract § 15 ¶7.

## II. DISCUSSION

### A. Applicable Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654,

657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

### B. Limitation of Liability

What the issue comes down to is which shall control: (a) the value declared on the bills of lading, or (b) the more general Full Invoice and $250,000 Limit provisions of the GE Contract.

Under the Carmack Amendment, the carrier is generally liable for "actual loss or injury to the property." 49 U.S.C. § 14706(a). An exception (the "release rate exception") allows the carrier to limit its liability "to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation." 49 U.S.C. § 14706(c)(1)(A).

UPS says that the bills of lading, stating a value of $2.30/lb., are a "written agreement between the carrier and the shipper" (or perhaps a "written ... declaration of the shipper") that limits UPS's liability. It may be, adds UPS, that the Warehouse breached its agreement with GE when it entered a value on the bills of lading; that lapse might give rise to a claim by GE against the Warehouse, but not against UPS.

GE replies that the GE Agreement is the controlling "written agreement between the carrier and the shipper," and that it renders UPS liable for the Full Invoice Value of the goods, subject only to the $250,000 Limit. Because the values declared in the bills of lading are "inconsistent with" the GE Contract, the § 2(E) Override Provision nullifies the bills of lading. In addition, says GE,

5

the §15 ¶7 Entire Contract clause bars UPS's theory, because the bill of lading, which is not a writing signed by both parties, cannot modify the GE Contract.

Generally speaking, a bill of lading may serve as a limitation on liability under the Carmack Amendment. In *Penske Logistics, Inc. v. KLLM, Inc.*, 285 F. Supp. 2d 468 (D.N.J. 2003) (Wolin, J.), the contract between the shipper and the carrier called for full value liability of $59,000. The bill of lading prepared by the shipper, however, declared a value of $1.50/lb., for a total of $6800. *Penske* enforced the limitation in the bill of lading.

A bill of lading is both a receipt and a basic transportation contract, and it may serve as a "written declaration" for purposes of the release rate exception. In some circumstances, said *Penske,* an issue might arise as to whether the shipper was properly informed of the "tariff," but not here. A bill of lading, drafted by the shipper itself, may validly cap the carrier's liability to the shipper:

> [W]here a shipper, rather than the carrier, drafts the bill of lading and chooses the release rate, the limitation of liability rate found on the bill of lading will be enforced against the shipper.

*Id.* at 473 (citing *Siren, Inc. v. Estes Express Lines*, 249 F.3d 1268, 1274 (11th Cir. 2001); *American Cyanamid Co. v. New Penn Motor Express, Inc.*, 979 F.2d 310, 314 (3d Cir. 1992)). The value as declared on the bill of lading was held to constitute the shipper's election of the release rate, and was held to limit the carrier's liability. *Id.* at 473–75.

So far, so good. The next question, however, is whether the GE Agreement overrides the bill of lading. As to that issue, *Penske* is suggestive, but not controlling. There, as here, the contract between the carrier and shipper had an override provision that "in the event of an inconsistency between the Bill of Lading and the KLLM Agreement, the KLLM Agreement prevailed." 285 F. Supp. 2d at 470. Under "Cargo Loss," the *Penske* contract provided that the carrier would be liable for "all loss or damage ... in accordance with 49 U.S.C. § 14706...." *Id.*

*Penske* cited familiar principles of contract law that interrelated writings should be construed as a single document, and that a contract should not be interpreted in a way that renders terms superfluous or meaningless. *Id.* at 474. The contract at issue there, it found, "incorporate[d] the Bill of Lading by reference in section two, Receipts, which requires each movement of goods to be 'evidenced by a written receipt.'" *Id.* It concluded that the declared value of the bill of lading should not be rendered meaningless.

I cannot so easily read the court's interpretation of the *Penske* contract onto this, the GE Contract. These are not the kind of simultaneously-executed, interlocking agreements to which the rules of contract interpretation cited in *Penske* most clearly apply. When the GE Agreement was signed, these bills of lading did not yet exist. One permissible reading of the Contract is that GE protected itself against the unknown terms of those future bills of lading by telling UPS, in effect, to ignore them to the extent they conflicted with the Agreement.[4] Thus default rules of contract interpretation may not help us where the very *purpose* of an Override Provision may be to render terms of the other contract superfluous. UPS contends that there is no such inconsistency; but where the contract requires $1 million, and the bill of lading requires $15,000, there may well be. Full Invoice Value and the amount on the bill of lading are not the same thing, and at least one permissible interpretation of the Agreement is that it overrides the bill of lading.

I am not saying that UPS is wrong; it may be right. I am also conscious of the need for predictability in this commercial shipping context. These matters, however, pose issues of fact that cannot be resolved on a motion for summary judgment.

---

[4] That GE contractually forbade its Warehouse from placing the value of goods on bills of lading tends to corroborate that intent, although it probably played no part in the mutual assent that resulted in the GE Contract with UPS.

7

## CONCLUSION

For the reasons stated above, the motion of UPS for partial summary judgment is DENIED. An appropriate Order accompanies this opinion.

Dated: March 31, 2016

KEVIN MCNULTY
United States District Judge